Steven Eckhaus (SE 1929)
Evan Belosa (EB 7959)
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
Tel: (212) 940-8800

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------X

MICHAEL  QUINN,                                          :        Civil Action No. 12 CV 02423 (KBF)

                plaintiff,        :

                          :

        -against-                                  :        <u>FIRST AMENDED COMPLAINT</u>

                          :

ELI  S. JACOBS,                                          :

               Defendant.        :
-------------------------------------------------X

Michael Quinn, for his First Amended Complaint against Eli S. Jacobs, alleges:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Michael Quinn, is a citizen of California.

2. Defendant, Eli S. Jacobs, is a citizen of New York.

3. The amount in controversy, without interest and costs, exceeds the sum specified by 28 U.S.C. § 1332.

4. A valid consent to jurisdiction and venue selection agreement requires the parties to resolve disputes in this Court. <u>See</u> Exhibit 1 at p. 2.

5. A substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

FACTS

6.     Mr. Quinn retired from Merrill Lynch in 1999 as Vice Chairman of the Asset Management Division.

7.     Mr. Jacobs has invested in numerous early stage businesses in a range of sectors.  He had some financial successes, including the $900 million acquisition of Telex Corp., which would be merged with Memorex to form, at the time, the world's second largest manufacturer of computer peripherals.  He bought the Baltimore Orioles in 1989, but in 1993, after he filed for bankruptcy protection under Chapter 11, the team was auctioned off by the Bankruptcy Court in New York.  Mr. Jacobs continued to invest in a number of companies, and some of Mr. Quinn's former colleagues, other financiers and technologists, as well as the private investment bank, Allen & Company, became investors in those companies.

8.     Mr. Quinn maintains a summer residence in Sun Valley, Idaho. In July 2009, during the Allen & Company Sun Valley Conference, one of those investors, Jerome Kenney, whom Mr. Quinn knew well from their years together as executives at Merrill Lynch, introduced him to Mr. Jacobs.

9.     The Sun Valley Conference is well known for drawing together innovative technologists, media executives, business leaders, financiers, political figures, cultural icons and philanthropists.

10.    At that first meeting, Mr. Jacobs told Mr. Quinn that he held controlling interests in a wide variety of companies that owned "disruptive

2

technologies," which, he explained, were technologies likely to effect radical changes in their industries.

11.     Mr. Jacobs told Mr. Quinn that he badly needed executive talent to direct and manage several of those companies.  Mr. Quinn appeared intrigued by that thought, and the meeting ended with the two agreeing to continue the conversation.

12.     Mr. Jacobs, from the second meeting onward, regularly suggested that Mr. Quinn could have a "senior management role" in at least one of his companies, including board membership, chairing one or two key committees, advising management, and perhaps doing the same for all of Mr. Jacobs' companies in the Colorado area.

13.     Between August 2009 and May 2010, Mr. Quinn had numerous meetings with Mr. Jacobs or his associates.  They met many times in Denver, and in Golden, Colorado.  They met five or six times in Mr. Jacobs' New York City offices; Mr. Quinn was even given a photo ID for access to Mr. Jacobs' offices.

14.     Three times in the last four months of 2009, Mr. Quinn flew to Denver from his home in Santa Barbara at Mr. Jacobs' expense: once to meet Mr. Jacobs for a few hours in the Denver airport, and another time to meet the management of GeoSyn Fuels ("GSF"), a private company led by Mr. Jacobs as Chairman.

15.     In September 2009, Mr. Jacobs  arranged for Mr. Quinn to visit his New York offices, to meet his young colleagues, and attend a breakfast meeting

3

at the Four Seasons Hotel in New York City.   During that trip, Mr. Jacobs also introduced him to the key man at GeoBiotics, a "waste to energy" company. Mr. Jacobs was Chairman of GeoBiotics and urged Mr. Quinn to invest, but Mr. Quinn was not interested.

16.   Mr. Jacobs then told Mr. Quinn that Todd Harvey, the CEO of GSF, badly needed the kind of talent and expertise that Mr. Quinn possessed, and that Mr. Quinn could have an important role in the company.  Mr. Harvey had technical, mining experience, but never moved a company from small scale to large scale, and did not have any experience in taking a company public--- which Mr. Jacobs represented was likely to occur within the next 18 to 24 months.

17.   In October 2009, based on Mr. Jacobs' promise of placing Mr. Quinn into a senior role at GSF, and his representations that GSF was close to being able to produce ethanol in commercial quantities, Mr. Quinn made an initial investment in GSF, followed by a second investment a month later.

18.   The parties continued to speak regularly.  In early December, 2009, Mr. Jacobs asked Mr. Quinn to meet him in Denver to learn more about yet another Jacobs venture, Alternative Packaging Solutions, LLC ("APS").   Mr. Jacobs had set a value on APS of between $13-16 million.  APS had a single asset, an unusual system of twisting its applicator head onto consumable spray items, such as bleach, hairspray, room fresheners, and the like. Mr. Quinn received a few samples and had family members test them, finding they were easy to use.

4

19.     Environmentally sensitive and caring young adults had created a market for products that were ecologically sound. Given that the aerosol can had not been changed all that much in about 90 years, it seemed to Mr. Quinn that there might be a market for the APS system.

20.     Mr. Quinn indicated he might be willing to invest $250,000 in APS if he was granted an active senior management role, a seat on the board, and allowed to head up several crucial oversight committees.

21.     Mr. Jacobs agreed that Mr. Quinn would have a significant management role at APS, might even serve as Chairman, and was considering moving APS to Denver to facilitate Mr. Quinn's taking that role.  Mr. Jacobs then suggested that Mr. Quinn invest $400,000 in APS.

22.     In mid-December 2009, during a meeting in Denver's Hotel Teatro with Mr. Jacobs and his associates, Koichi Kurisu and Dick Harris, Mr. Jacobs reiterated that if Mr. Quinn would invest $400,000 in APS he would be given "senior management responsibilities."

23.     Based on Mr. Jacobs' offer of a significant management role, in a company that appeared to have a promising product, Mr. Quinn made the decision to invest the larger amount in APS, purchasing 28,548 APS LLC Units at a per unit price of $14.01, for a total investment of $400,000.  Because Mr. Jacobs represented that APS had only $200,000 in Units available, Mr. Quinn purchased half of the APS LLC Units from APS, and half from Mr. Jacobs personally.

24.     After months of urging by Mr. Jacobs, Mr. Quinn flew to Denver and drove to Pueblo for a due diligence inspection of The Water Company. Mr. Jacobs had been especially vocal about the potential of The Water Company, and represented that it was near to closing several large contracts involving the abatement of contaminated water at nuclear power plants. Several notable securities industry professionals were on the board of directors of The Water Company, including Stan O'Neal, the former CEO of Merrill Lynch. Mr. Jacobs placed a $100 million valuation on The Water Company.

25.     Upon visiting The Water Company, Mr. Quinn was disappointed with what he found. He did not find a budding engineering firm on the brink of large environmental abatement contracts. Instead, he found a small operation that, in Mr. Quinn's opinion, did not appear to have the capacity depicted by Mr. Jacobs.

26.     Mr. Jacobs phoned Mr. Quinn as he drove back to Denver. Mr. Quinn conveyed his disappointment, his numerous concerns, and his firm decision that he would not invest in The Water Company. In reaction, Mr. Jacobs became enraged and verbally abusive. Mr. Jacobs stated that The Water Company was within a year of huge contracts, and would soon be worth one billion dollars.

27.     As a result of the phone call after the Pueblo visit, and subsequent phone calls in which Mr. Jacobs exhibited a similar temperament, Mr. Quinn came to understand that Mr. Jacobs did not accept any dissension from those

6

around him.  Mr. Jacobs labeled as "seditious," even long time investors and friends who questioned his pronouncements, including John Hennessy, the former Chairman and CEO of Credit Suisse First Boston, who had not only invested in Mr. Jacobs' companies, but had also made personal loans to him.

28.  At the same time that Mr. Quinn was learning more about Mr. Jacob's personality, he was waiting for Mr. Jacobs to honor his agreements to place him in leadership roles at APS and GSF.

29.  On December 29, in a meeting at Mr. Jacobs' New York City offices also attended by Jerome Kenney,  Mr. Jacobs promised to "spell out Mr. Quinn's APS  duties . . . within a few days," with a resolution of Mr. Quinn's duties at GSF  following closely behind.  Mr. Jacobs also agreed that Mr. Kenney arbitrate any disputes that might arise between Mr. Quinn and Mr. Jacobs.

30.  During January and February, Mr. Quinn spent  considerable time and effort meeting with or talking to Koichi Kurisu and Dick Harris of APS, and helping to connect Mr. Harris with a number of industrial companies that might assist him in expanding APS.  Mr. Harris  greatly appreciated those efforts, and in March sent a letter to Mr. Quinn stating as much.

31.  In late February, Mr. Jacobs faxed to Mr. Quinn the long-awaited description of his duties for APS.  The second point was the duty to "assist in capital raises," which meant, Mr. Jacobs explained, that Mr. Quinn needed to bring other investors into APS.

7

32.    In the nearly eight months that Mr. Jacobs and Mr. Quinn had been discussing Mr. Quinn's potential participation, it had never before been suggested that Mr. Quinn would be expected to solicit investors. Mr. Quinn immediately contacted Mr. Kenney, who agreed that there had never been any discussion of Mr. Quinn having any responsibility for raising capital.

33.    Mr. Quinn contacted Mr. Jacobs and made it clear he was ready and willing to commit to all the other aspects of the APS duties Mr. Jacobs had spelled out, but not active "fundraising." Mr. Jacobs summarily ended the conversation.

34.    Mr. Jacobs then told Mr. Kurisu and Mr. Harris that Mr. Quinn would "play no role whatsoever in APS going forward." Mr. Harris informed Mr. Quinn of that edict. Mr. Quinn called Mr. Jacobs to inquire, and was told there was nothing more to talk about with regard to APS.

35.    Hearing this, Mr. Quinn asked Mr. Jacobs to refund his $400,000 investment in APS. He also asked for Mr. Kenney to arbitrate the dispute over Mr. Jacobs' refusal to appoint him to an APS management role, and to arbitrate the dispute over Mr. Jacobs' continuing failure to appoint Mr. Quinn to the GSF board. In addition to his financial investments in APS and GSF, Mr. Quinn had spent hundreds of hours advising the management and board members of APS and GSF, and he did not take Mr. Jacobs' intransigence lightly.

36.    Although Mr. Quinn wanted his APS investment returned immediately, he agreed to give Mr. Jacobs time to attempt to sell APS LLC Units,

8

which would facilitate a refund of his $400,000 investment. In consideration of Mr. Quinn giving Mr. Jacobs time to come up with $400,000, Mr. Jacobs agreed that after a period of time, Mr. Quinn could "put" his Units back to Mr. Jacobs in exchange for the amount of his original investment, $400,000. plus interest.

37.    On April 22, 2010, Mr. Jacobs executed and delivered to Mr. Quinn an agreement on Mr. Jacobs' own letterhead, promising to pay Mr. Quinn, *inter alia*, $400,000, with interest, for Mr. Quinn's APS LLC Units, if Mr. Quinn "put" those Units to Mr. Jacobs in the 30 day period beginning January 15, 2012 (the "APS Put Agreement"). The APS Put Agreement, a true copy of which is made Exhibit 1 to this Complaint, states in relevant part that:

> If at January 15, 2012 you should continue to own any Units, you shall have the right, to be exercised within 30 days thereafter, to sell to me, such Units. The purchase price therefor (the "Purchase Price") will be $14.01 per Unit, plus interest thereon beginning July 1, 2010. Interest shall be calculated at a per annum rate of 5% for the period July 1, 2010- December 31, 2010; and after December 31, 2010, interest shall also accrue on the aggregate amount of accrued interest at December 31, 2010.

38.    On January 17, 2012, Mr. Quinn informed Mr. Jacobs, by letter sent certified, first class mail, that he was exercising his right to sell Mr. Jacobs his APS LLC Units, (the "Put Letter"). A true copy of the Put Letter is made Exhibit 2 to this Complaint.

9

39.    As set forth in the Put Letter, the total amount owed to Mr. Quinn from Mr. Jacobs for the sale of the APS LLC Units, as of January 15, 2012 was $431,428.63, with interest accruing at a rate of $56.18 per day.

40.    This amount represented Mr. Quinn's original investment of $400,000, plus interest determined pursuant to the APS Put Agreement. Mr. Jacobs has not paid the amount he owes to Mr. Quinn for the Units that Mr. Quinn put to him. Mr. Jacobs' failure to pay for the APS LLC Units that Mr. Quinn put to him is a material breach of the APS Put Agreement.

41.    On February 3, 2012, Mr. Jacobs conveyed a suggestion to Mr. Quinn, that he withdraw his put because the APS Units will soon be more valuable. Mr. Quinn conveyed the message that he just wanted his money back and requested Mr. Jacobs pay him for the shares.

[remainder of page intentionally left blank]

## DEMAND FOR JUDGMENT

Therefore, the plaintiff, Michael Quinn, demands judgment against the defendant, Eli S. Jacobs, for $431,428.63 plus interest from January 15, 2012 at the rate of $56.18 per day, and costs.

## DEMAND FOR A JURY TRIAL

Pursuant to the Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure, Mr. Quinn demands trial by jury on all issues.

Dated:   New York, New York
         April 27, 2012

                        KATTEN MUCHIN ROSENMAN LLP

                        By:_____
                           Steven Eckhaus (SE 1929)
                           Evan Belosa (EB 7959)
                           575 Madison Avenue
                           New York, New York 10022-2585
                           Steven.eckhaus@kattenlaw.com
                           Tel: (212) 940-8860
                           Fax: (212) 894-5925

                           *Attorneys for the plaintiff*
                           *Michael Quinn*

        To: David E. Ross, Esq.
            Kasowitz, Benson, Torres & Friedman LLP
            1633 Broadway
            New York, NY 10019-6799

            *Attorneys for the defendant*
            *Eli S. Jacobs*

1

,05/18/2010  08:42   7603456043                                              PAGE 04/05
MAY-17-2010 MON 01:29 PM KATTEN MUCHIN ROSENMAN    FAX NO. 12128408994    P. 04
May 11 10 08:36a    Jan Quinn                              8059693314       p.4
APR/23/2010/FRI 02:25 PM                      FAX No.                    r, 004

Eli Jacobs
641 Lexington Avenue
New York, NY 10022

April 22, 2010

Michael Quinn
416 Meadowbrook Drive
Montecito, CA 93108

**APS Equity Investment**

Dear Michael:

Reference is made to the equity securities (the "Securities") of Alternative Packaging Solutions, L.P. ("APS") that you purchased earlier this year from me and APS for $400,000. The Securities consist of 28,548 LLC Units ("Units"), which you purchased at a per Unit price of $14.01. In consideration of the mutual agreements provided herein and for other valuable consideration, by our signatures below, we agree to the following.

I expect APS to conduct an equity offering later this year. During the course of that offering or thereafter, I will attempt to identify potential buyers of all or a portion of the Securities at a price per Unit at or exceeding the price you paid.

If at January 15, 2012, you should continue to own any Units, you shall have the right, to be exercised within 30 days thereafter, to sell to me, such Units. The purchase price therefor (the "Purchase Price"), will be $14.01 per Unit, plus interest thereon beginning July 1, 2010. Interest shall be calculated at a per annum rate of 5% for the period July 1, 2010-December 31, 2010; and after December 31, 2010, interest shall also accrue on the aggregate amount of accrued interest at December 31, 2010. Interest shall be calculated on actual days elapsed over a year of 365 days. If prior to your exercise of this right, you shall have transferred any Units, the Purchase Price payable by me shall reduced by an amount equal to the greater of (x) the product of the number of Units theretofore transferred multiplied by $14.01, and (y) the actual proceeds you shall have received from the transfer of such Units. This right is personal to you and your estate, if applicable.

I shall have the right at any time at any time or from time to time during the period January 1, 2011-December 31, 2012 to require you to sell to me or my designee any or all Units owned by you at a price equal to the Purchase Price I would have been required to pay to you pursuant to the preceding paragraph if you had exercised that right at that time, assuming for this calculation that your right to cause me to purchase your Units shall not have been time-limited as provided in

the preceding paragraph. This right shall also be personal to me and my estate, if applicable.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein without giving effect to the principles of conflicts of law. Each party shall comply with all applicable laws, rules and regulations. Any litigation brought by either party under this Agreement shall be resolved by a state or federal court situated in the borough of Manhattan in the City and State of New York.

All notices, requests, consents, and other communications hereunder to any party shall be deemed to be sufficient if contained in a written instrument delivered to such party at the address set forth herein, or such other address as may hereafter be designated in writing by such party to the other party. All such notices, requests, consents, and other communications shall be deemed to have been delivered (a) in the case of personal delivery or email, if appropriate, on the date such delivery is confirmed, (b) in the case of delivery by fax, on the day following the day of transmission provided that the sender has received electronic confirmation of successful transmission, and (c) in the case of dispatch by internationally-recognized overnight courier, on the business day the courier confirms delivery.

If the foregoing correctly sets forth our agreement, please sign where indicated below.

Sincerely,

Eli S. Jacobs

AGREED TO:

Michael Quinn
5/17/10

2

**Mr. Michael Quinn**
**43231 Via Siena**
**Indian Wells, California 92210**

January 17, 2012

VIA CERTIFIED FIRST CLASS MAIL
AND FEDERAL EXPRESS

Mr. Eli S. Jacobs
641 Lexington Avenue
New York, NY 10022

Re:   **APS Equity Investment**

Dear Mr. Jacobs:

Reference is made to the letter agreement between you and me, dated as of April 22,
2010 (the "Agreement"), a copy of which is attached.  Capitalized terms used in this
letter but not otherwise defined herein shall have the meanings ascribed to such terms in
the Agreement.

Pursuant to the terms of the Agreement, I am entitled to sell you all of the "LLC Units" of
Alternative Packaging Solutions L.P. ("Units") that I purchased from you and that I
continue to own as of January 15, 2012.  I hereby exercise this put right pursuant to the
Agreement and require you to purchase all 28,548 Units at the Purchase Price determined
in accordance with the Agreement on the basis of a 365-day year and actual days elapsed,
as follows:

(i)      $400,000 (representing the purchase price of $14.01 per Unit), *plus*

(ii)     $10,082 (the interest amount accruing on $400,000 at 5% per annum for the 184
days between July 1, 2010 and December 31, 2010); *plus*

(iii)    $20,504 (the interest amount accruing on $410,082 at 5% per annum for the 365
days between January 1, 2011 and December 31, 2011); *plus*

(iv)     $842.63 (the interest amount accruing on $410,082 at 5% per annum for the 15
days between January 1, 2012 and January 15, 2012); *plus*

(v)      $56.18 for each day after January 15, 2012 that the amounts set forth in clauses (i)
through (iv) above remain unpaid.

<u>Accordingly, the total Purchase Price payable as of January 15, 2012 is $431,428.63, plus
$56.18 for each day thereafter through the date of payment.</u>

Please remit such amount by wire transfer of immediately available funds as soon as
possible to my counsel's account detailed on Schedule 1 hereto.

Nothing contained herein shall constitute a waiver of any default, breach or violation of
the Agreement by you, and nothing contained herein shall constitute a waiver of any right
or remedy that I may have in connection with any default, breach or violation of the
Agreement by you, all of which are hereby reserved.

Very truly yours,

Michael Quinn

cc:   Katten Muchin Rosenman LLP
      575 Madison Avenue
      New York, New York 10022
      Attention: Steven Eckhaus, Esq.

STATE OF NEW YORK   )
                         :                     CERTIFICATE OF SERVICE
COUNTY OF NEW YORK  )

Evan Belosa, an attorney-at-law, duly admitted to the Courts of the State of New

York, hereby certifies that on the 27th day of April, 2012, I caused a true copy of the annexed

FIRST AMENDED COMPLAINT to be served by hand upon the following named attorney(s) at

the address indicated:

> David E. Ross, Esq.
> Kasowitz, Benson, Torres & Friedman, LLP.
> 1633 Broadway
> New York, NY 10019-6799

I certify under penalty of perjury that the foregoing is true and correct.

Dated: 4/27/2012

_____
Evan Belosa